FILED

2007 Apr-27  AM 11:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **LAURIE HEALY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-05-S-2637-NE** |
| | ) | |
| **EXPRESS JET, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Plaintiff, Laurie Healy, commenced this action on December 30, 2005, asserting claims against Express Jet, Inc., her former employer, for retaliation, gender-based discrimination, and gender-based harassment pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000 *et seq*.[1] The case now is before the court on defendant's motion for summary judgment.[2]  Upon consideration of the motion, briefs, pleadings, and evidentiary submissions, the court concludes the motion should be granted.

### PART ONE

*Standard of Review*

Federal Rule of Civil Procedure 56(c) provides, in the part pertinent here, that

---

[1] Doc. no. 1 (Complaint).
[2] Doc. no. 10.

summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corporation v. Catrett*, 477 U.S. 317, 322 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)) (internal quotation marks and citations omitted).

In the present case, however, plaintiff failed to respond to the statement of facts

-2-

in defendant's brief in support of summary judgment.  Thus, defendant's statement

of facts are deemed admitted, in accordance with the following section of this court's

Uniform Initial Order:

> The first section [of the opposing party's statement of facts] must
> consist of only the non-moving party's disputes, if any, with the moving
> party's claimed undisputed facts.  The non-moving party's response to
> the moving party's claimed undisputed facts shall be in *separately
> numbered paragraphs* that coincide with those of the moving party's
> claimed undisputed facts.  Any statements of fact that are disputed by
> the non-moving party must be followed by a specific reference to those
> portions of the evidentiary record upon which the dispute is based.  ***All
> material facts set forth in the statement required of the moving party
> will be deemed admitted for summary judgment purposes unless
> controverted by the response of the party opposing summary
> judgment***.[3]

## PART TWO

*Summary of Facts*

**A.**   *Plaintiff's Employment History*

Plaintiff, Laurie Healy, began working for defendant, ExpressJet, Inc., on May

1, 2003, as a Supervisor in the Huntsville, Alabama, station.[4]  Her position was at an

intermediate level of supervisory authority, and she reported directly to the Huntsville

station's General Manager ("GM"), who, at all times relevant to this lawsuit, was Guy

---

[3]Doc. no. 5 (Uniform Initial Order), at 16-17 (italicized emphasis in original; boldface emphasis supplied).

[4]Doc. no. 10 (motion for summary judgment), Exhibit A (Deposition of Laurie Healy), at 10.

Simpson.[5]  Prior to commencing her employment with ExpressJet, plaintiff worked

as an agent for Continental Airlines, ExpressJet's parent company, for approximately

three years, and sometimes also served as an "acting supervisor."[6]  Other than her

experience as an "acting supervisor" with Continental and some prior experience

working in her mother's clothing store, plaintiff had no supervisory work experience

before commencing her employment with ExpressJet.[7]

Guy Simpson interviewed and hired plaintiff for the Supervisor position in

Huntsville.[8]  Plaintiff was one of fourteen candidates for the position, ten of whom

were male, and four of whom were female.[9]

The Huntsville station of ExpressJet is a "cross-utilized" station, meaning that

all agents must be able to perform all job duties at various times.[10]  Plaintiff's position

was categorized as a "working supervisor," which meant that she was required to

perform the duties of an agent in addition to her duties as Supervisor.[11]  Plaintiff

described her job duties to include ensuring the agents received proper training,

---

[5]*Id.   See also* doc. no. 15 (plaintiff's supplemental evidentiary submission), Exhibit 1 (Affidavit of Laurie Healy), at ¶ 2.

[6]Healy Deposition, at 11-12.

[7]*Id.* at 37-38.

[8]*Id.* at 13-14.

[9]Doc. no. 10 (motion for summary judgment), Exhibit B (Declaration of Elise Streeter), at ¶ 2.

[10]Healy Deposition, at 22.

[11]*Id.* at 44.

assisting in scheduling and payroll functions, approving changes in the work schedule and agents' requests for vacation time, and ensuring the station's compliance with ExpressJet's employee handbook.[12]  She also conducted regular meetings with agents and kept minutes of those meetings, conducted reviews and counseling sessions with agents, worked to ensure that flights left the airport on schedule, handled baggage claims and any other problems with flights, and communicated with pilots and control towers to ensure compliance with federal flight regulations.[13]  She was responsible for providing a daily report to Simpson on baggage performance and the timeliness of flight departures.[14]  Plaintiff worked closely with Simpson on all management issues, and she was expected to support his decisions, even if she did not agree with them.[15]

**B.**   *Events Leading Up To Plaintiff's Termination*

Plaintiff testified that, during her employment at the Huntsville station, she received numerous complaints from agents about Guy Simpson's management style. At unspecified times, agents complained that Simpson:  (1) awarded light duty assignments to male employees; (2) denied employees' requests for leave under the

---

[12]*Id.* at 43.

[13]*Id.* at 44.

[14]*Id.* at 156, 275-77.

[15]*Id.* at 51-52.

Family and Medical Leave Act; (3) refused employees' requests for specially designated leave in emergency situations; (4) enforced dress code and hygiene rules against female employees, but not against male employees; (5) showed favoritism in handling employees' requests to change shifts or to receive time off; and (6) refused to purchase basic supplies for the office, causing agents to purchase the supplies with their own money.[16]   Additionally, sometime "before spring" in 2004, plaintiff reported to Simpson that agent Valerie Watts had called agent Marilyn Crowley an "old bitch" and said Ms. Crowley needed to retire.[17]   As a result of all of these problems and complaints, morale among the employees in the Huntsville station declined.

In approximately May of 2004, a series of written communications, meetings, and disciplinary actions took place in response to the employees' complaints and other events.  The following discussion outlines these events and responses in rough chronological order.

**1.**     *May 24, 2004*

On May 24, 2004, plaintiff sent an email to all of the agents in Huntsville, providing a long list of all actions that could lead to an employee receiving a "write-

---

[16]*Id.* at 58-63, 95-96.

[17]*Id.* at 97-101.

up" as disciplinary action.[18]  Plaintiff testified that she sent the email in response to

complaints about favoritism being shown to certain agents, so that all agents would

be equally aware of workplace rules.[19]

On the same day, the Employee Involvement Team ("EIT") representatives[20]

for the Huntsville station conducted a meeting and drafted a "Memorandum for

Record" to be sent to Guy Simpson via plaintiff.   The subject line of the

memorandum read, "Employee Complaints Regarding General Manager's

Management Practices and Subsequent Extremely Low Morale in the Workplace."

The purpose of the memorandum was to convey the Huntsville employees' "extreme

dissatisfaction with current management practices," including problems with

> dignity and respect toward agents by the GM; managerial indiscretion
> on the part of the GM; age discrimination by the GM; lack of fairness
> and continued favoritism by the GM toward select employees; confusing
> and inconsistent guidance by the GM; inconsistent and unfair
> application of punishment for violations by individual agents by the
> GM; and failure by the GM to praise/recognize employees for jobs well
> done.[21]

The EIT representatives also complained that agents were confused over the role

---

[18]Doc. no. 10 (motion for summary judgment), at Exhibit D (May 24, 2004 email from plaintiff).

[19]Healy Deposition, at 115-16.

[20]An EIT representative is a non-managerial employee who is elected by other non-managerial employees to serve as a liaison between employees and management.   Streeter Declaration, at ¶ 5.

[21]Doc. no. 10 (motion for summary judgment), at Exhibit E (May 24, 2004 Memorandum for Record).

plaintiff was intended to play as Supervisor, and that agents were afraid of retribution for raising complaints against Simpson.[22]  Plaintiff did not participate in drafting this memorandum; rather, her only involvement was to forward the document to Simpson after it was presented to her.[23]

### 2.    *May 26, 2004*

Simpson held a meeting with all Huntsville agents on May 26, 2004, to address issues raised in the May 24 memorandum.  Plaintiff attended the meeting, but did not stay for its entire duration.[24]  The minutes of the meeting indicate that a number of complaints were addressed, including scheduling issues, Simpson's failure to praise agents for their work, the purchase of office supplies, television and telephone privileges for employees in the break room, assignment of work duties, Simpson's sometimes flirtatious interaction with female employees, and general employee morale.[25]  Simpson also discussed the confusion over plaintiff's proper role as Supervisor.  Simpson identified "the problem" as plaintiff's failure to consult him before implementing changes to procedures or policies.[26]  Simpson also informed the

---

[22]*Id.*

[23]Healy Deposition, at 117, 121.

[24]*Id.* at 123.

[25]Doc. no. 10 (motion for summary judgment), at Exhibit F (May 26, 2004 Memorandum for Record).

[26]*Id.* at ¶ 14.

agents that Ewan Barr — the Regional Senior Director over the region encompassing the Huntsville station — would be in Huntsville the following week to meet with each employee, and encouraged the employees to type up suggestions for Barr about how to improve the workplace situation.[27]  At the end of the meeting, a majority of the agents present voted to send their complaints about Simpson to the corporate Human Resources Department.[28]  Plaintiff testified that she "had nothing to do with" that decision.[29]

### 3.    *May 29, 2004*

On May 29, 2004, plaintiff sent a four-page email to Ewan Barr, to "prepare" him for what he might encounter on his upcoming visit to Huntsville.[30]  She described at length the agents' dissatisfaction with and distrust for Simpson as General Manager, and the resulting decline in employee morale and performance.  She also expressed her personal frustration with the situation, and acknowledged having previously expressed this frustration to the other agents.[31]

Plaintiff also acknowledged that she had "acted insubordinately [toward

---

[27]*Id.* at ¶¶ 17-18.

[28]*Id.* at ¶ 19.

[29]Healy Deposition, at 125-26.

[30]Doc. no. 10 (motion for summary judgment), at Exhibit G (May 29, 2004 email from plaintiff to Ewan Barr).

[31]*Id.* at 1.

Simpson] at times, more lately than in past," but stated that she did not regret her actions.[32]  Specifically, she had "stepped in the middle of [Simpson] and agents being publicly humiliated and told him to back off and take it out on me."[33]  Plaintiff elaborated on this incident in her deposition.  She testified that she overheard Simpson yelling at a female agent "in front of everyone" over a problem with a flight. She intervened, telling Simpson, in front of other agents, "Guy, that's enough, that's enough," and "Guy, calm down, that is enough."[34]  In her email to Barr, plaintiff also acknowledged that she had gone over Simpson's head in ordering pens and first aid supplies for the office, assigning work hours to new hires, and telling agents to come to her first with all of their problems.[35]

Plaintiff also informed Barr that Simpson told her she was hired because he "'had' to have a woman supervisor at that time."  Simpson had also told plaintiff that he had interviewed other women, but she was the most qualified.[36]  In her deposition, plaintiff provided the context for this remark.  She testified that she became frustrated with Simpson for not allowing her to perform what she considered to be the duties of a Supervisor, and she asked him why he even bothered hiring a Supervisor in the first

---

[32]*Id.* at 1-2.

[33]*Id.* at 2.

[34]Healy Deposition, at 141-42.

[35]Doc. no. 10, Exhibit G, at 1-2.

[36]*Id.* at 2.

place if he didn't plan to allow her to do the job.  Simpson replied with his comment about needing to hire a woman, which plaintiff interpreted as responsive to sexual harassment complaints that had been lodged in the Huntsville station before she began working there.[37]

Finally, plaintiff attempted to disabuse any notions that she might be conspiring to take Simpson's job.  She acknowledged that she wanted to become a General Manager, and that her aspirations were widely known among the Huntsville agents. Nonetheless, she maintained that she did not want to take *Simpson's* job.[38]

    **4.**    *June 2004*

Several events occurred in June of 2004 related to the management and morale problems in the Huntsville station.  First, on June 2 and 3, 2004, Ewan Barr conducted his scheduled visit to the Huntsville station and encouraged agents to bring all of their concerns to him.[39]   While in Huntsville, Barr "addressed numerous operational issues with the agents, including ExpressJet's policies on scheduling, bidding, and cross-utilization."[40]  He directed Annicia Miller, the Human Resources Manager for the Huntsville area at the time, to follow up with a second station visit.[41]

---

[37]Healy Deposition, at 107-12.

[38]Doc. no. 10, Exhibit G, at 3.

[39]Doc. no. 10, Exhibit H (Declaration of Ewan Barr), at ¶ 3.

[40]*Id.*

[41]*Id.*

Annicia Miller visited Huntsville on June 10 and 11, 2004. Notes from her visit reveal her perceived needs for "Consistent management style" and better communication between plaintiff and Simpson.[42] Miller also wrote two letters to agents Marilyn Crowley and Valerie Watts after the visit.[43] These letters discuss the derogatory comment Ms. Watts made about Ms. Crowley's age in the workplace. ExpressJet conducted an investigation into the situation, and concluded that the comments were unprofessional and inappropriate. As a result, Ms. Watts was reprimanded, and she and all other Huntsville agents were required to attend a "With All Due Respect" training session in Huntsville on June 17, 2004, to review ExpressJet's policies on appropriate workplace behavior.[44] Additionally, plaintiff counseled Ms. Watts to control her temper and behave more appropriately.[45]

**5.**   *August 25, 2004*

Barr summoned plaintiff and Simpson to attend a meeting with him and other management personnel at ExpressJet's corporate headquarters in Houston, Texas, on August 25, 2004, to address continued negative reports from the agents in the Huntsville station. Barr's purpose was to ensure that both plaintiff and Simpson

---

[42]Streeter Declaration, at ¶ 4.

[43]Doc. no. 10, at Exhibit I.

[44]*Id. See also* Healy Deposition, at 153.

[45]Healy Deposition, at 99.

gained a "clear understanding of [management's] expectations, [and the company's] performance, communications, dignity, and respect" requirements.[46]

In the August 25 meeting, Barr became angry, telling plaintiff and Simpson he was "sick and tired" of all the complaints from the Huntsville station.[47]  Plaintiff was unsure what she had done wrong, and Barr informed her that her inability to get along with Simpson was creating problems.[48]  Simpson expressed his concern that the Huntsville agents were trying to get him fired, and plaintiff attempted to reassure him that wasn't true.  At that point, Barr pointed his finger at plaintiff and told her, in an angry tone, "If he goes you go."[49]  Later in the meeting, Barr and the other management personnel present established a thirty-day time frame for plaintiff and Simpson to "improve the performance and the communication and the dignity and respect" among employees in the Huntsville station.[50]  They also directed plaintiff and Simpson to form a communications committee to further these goals.[51]  After returning to Huntsville, Simpson directed plaintiff to type up some ballots to elect the members of the communications committee.  She complied, but did not take any

---

[46]Doc. no. 10, Exhibit K (Notice of August 25, 2004 meeting).

[47]Healy Deposition, at 170.

[48]*Id.*

[49]*Id.* at 171.

[50]*Id.* at 175.

[51]*Id.* at 175, 180.

-13-

further actions to meet the goals for improvement established by Barr.[52]  As she testified, "I just did what Guy told me to do.  I didn't want to do anything outside of that."[53]

**6.**   *October 17, 2004*

Plaintiff sent a three-page email to Simpson on October 17, 2004, which she testified was prompted by an incident that had occurred the previous day.[54]  An agent named Dorcas Pearson had recently lost an inter-office election against agent Chris Kratsch for the position of EIT representative.  Pearson grew so upset over the election results that she threatened to bring a gun to the station and kill everyone present, a threat for which she later was discharged.[55]  Other agents later informed plaintiff that Simpson was blaming her for the Pearson incident, because of the way she had handled the EIT election.[56]

In the email, plaintiff defended her actions in handling the EIT election, and insisted that she did nothing that resulted in or contributed to Pearson's outburst.  She told Simpson that his suggestion that she should have discussed the situation with Pearson before it escalated was "totally inappropriate and irrelevant to the current

---

[52]*Id.* at 175, 185.

[53]*Id.* at 185.

[54]Doc. no. 10, at Exhibit L (October 17, 2004 email).  *See also* Healy Deposition, at 187.

[55]Healy Deposition, at 187-89.

[56]*Id.* at 190-91.

threatening situation."[57]   She also wrote, "[b]efore you start trying to redirect the problem to be held by someone else I suggest you have the facts."[58]   Plaintiff also criticized Simpson about his conduct in a prior meeting with Pearson, during which he allowed Pearson to take a personal call on her cellular telephone.[59]   Plaintiff also complained about Simpson showing favoritism to certain agents, and about being held responsible for Simpson's shortcomings and errors.  She wrote, "This is not about me, as much as you would like to make it about me, it is not, nor will you be able to find a way to twist and turn this so that I will be your fall guy for you,"[60] and "I do not appreciate you telling the agents your feelings regarding what position you feel I should have taken when you have not discussed anything with me."[61]   Plaintiff also accused Simpson of "pitting agents against one another," and complained about Simpson's assignment of light duty to certain agents and his posting of a new schedule.[62]   With regard to the schedule issue, plaintiff wrote, among other statements, that:  "I will not be held responsible for your actions on this schedule because I have not seen, nor had anything to do with it"; "I do not have a problem

---

[57]Doc. no. 10, Exhibit L, at 1.

[58]*Id.*

[59]*Id.*

[60]*Id.*

[61]*Id.* at 2.

[62]*Id.*

with whatever you want me to work or whatever days you want me to have off but just the common curtesy [sic] of consulting me for my thoughts would have been the appropriate thing to do"; and "I will tell you that there are agents that feel you are being vindictive and your schedule certainly indicates that."[63]

Plaintiff also expressed her concern over her future with ExpressJet, stating, "I have lost all opportunity for growth in this company between your labels and Ewan Barr's threats of if he goes . . you go.  I cannot make you communicate with me.  I cannot get you to listen."[64]  She described Ewan Barr's actions as "extremely unprofessional" and stated, "I also want to mention that Ewan Barr running around telling people in corporate that the issues in [Huntsville] are all petty ones is getting back to the agents."[65]  Plaintiff concluded the email by stating,

> I am sure there are plenty of other issues that need to be addressed but I have grown weary of this battle and felt the need to tell you that despite the fact that you feel I am the one you should be distrusting with, you might want to reconsider your approach because you are wrong. You cannot say that I did not tell you because here it is . . . in writing.[66]

Plaintiff acknowledged she was upset when she wrote the email, and admitted that some portions of the email could be construed as disrespectful.  In her deposition,

---

[63]*Id.*

[64]*Id.* at 3.

[65]*Id.*

[66]*Id.*

however, plaintiff refused to characterize the email as "insubordinate."[67]

**7.** *October 26, 2004*

On October 26, 2004, Simpson issued plaintiff a letter, which stated in full:

Regarding your email dated Oct. 17th, 2004. I find this email to be offensive, disrespectful and insubordinate toward me as your General Manager.

Your email has many misleading and inaccurate statements based on hearsay which you present as being accurate and factual.

As a Supervisor your primary role is to support the General Manager in the operation and administration of the station, so that we may provide a consistent direction and leadership to our employees. You fail to do this on a regular basis and you frequently voice your disagreement with my direction to you in front of employees, which again is disrespectful and insubordinate.

While open communication between us is encouraged and you have a right to disagree and challenge some of the decisions I make, my expectation is for you to support me in the day to day operation of this station. It is not your role to violate our confidentiality by disagreeing with the decisions I have made in front of employees, or having separate conversations with employees in an attempt to reverse procedures and local policies that I have put in place.

From now on I expect you to maintain and respect the confidentiality of our conversations. You are not to share the content of our conversations with any employees unless specifically told to do so by me.

I know that you are capable of performing to my expectations in the role of Supervisor, but if you are unable to do so, I will have to take

---

[67]Healy Deposition, at 200, 210.

additional steps up to and including termination.[68]

On the same day, Simpson issued plaintiff a memorandum about his expectations for her job performance.  Simpson addressed a decline in the overall performance of the Huntsville station since April of 2004.  According to Ewan Barr, the Huntsville station had fallen well below the national average on performance measures such as headstart operations[69] and baggage performance.[70]  Specifically, in April of 2004, the Huntsville station performed at a level of eighty-five percent, which roughly comported to the national average.  The station's performance fell to forty-five percent in May, forty percent in June, fifty-nine percent in July, sixty-four percent in August, forty-seven percent in September and October, and forty-two percent in November and December.  All of these scores rank well below the national averages for the months in question.[71]  Indeed, the station's performance did not again approach the national average until January of 2005.[72]

In response to these declines in the station's performance, Simpson outlined specific goals plaintiff was expected to achieve in the areas of headstart operations,

---

[68]Doc. no. 10, at Exhibit N (October 26, 2004 letter from Guy Simpson to plaintiff).

[69]The record does not clearly reflect what "headstart operations" are, but it is clear that ExpressJet considered them a measure of an employee's performance.

[70]Barr Declaration, at ¶ 7.

[71]The national average was 67.5% in May, 60.3% in June, 71.3% in July, 80.2% in August, 82.7% in September, 74.6% in October, 73.9% in November, and 66.4% in December.  Barr Declaration, at ¶ 7 and Attachment 1.

[72]*Id.*

baggage performance, and administration.  He also stated:

> I expect you to report to me in a clear and concise manner in each of the above areas on a weekly basis including any corrective actions taken.
>
> As of now your performance is below target.  I am willing to work with you to improve your current level of performance.  Please take some time to review the expectations, additionally; [sic] I am here to help in any way possible with instruction or clarification of the items. I am looking for your commitment in making progress in the above areas within the next 30 days.  At the conclusion of the first 30 days we will review the expectations.  This is a serious matter and without your commitment, I will have no other choice but to take additional disciplinary action up to and including termination.[73]

**8.**   *November 30, 2004*

Elise Streeter, who at the time of these events was a Corporate Training Manager for ExpressJet, traveled to Huntsville on November 30, 2004, to attend a first-level hearing on the grievance filed by Dorcas Pearson following her termination.[74]  During the visit, Ms. Streeter heard plaintiff comment, in a public area, that she did not like Simpson's management style or communication skills.  Specifically, plaintiff stated, "'He doesn't tell me anything.'"[75]  Ms. Streeter also overheard plaintiff referring to Ms. Pearson's grievance within earshot of other agents, and joking with another agent in a manner that suggested the two were

---

[73]Doc. no. 10, at Exhibit O (October 26, 2004 memorandum from Guy Simpson to plaintiff).

[74]Streeter Declaration, at ¶ 6.

[75]*Id.*

pleased that Ms. Pearson was no longer employed with ExpressJet.[76]

**9.**    *December 2004*

Streeter reported the observations from her Huntsville visit to Ewan Barr and Karen Miles, the Vice-President of Human Resources, on November 30 and December 1, 2004. Barr asked Miles if she would support the decision to terminate plaintiff's employment, and Miles responded affirmatively on December 3, 2004.[77] Barr stated that he felt termination was warranted, because plaintiff's conduct during Ms. Streeter's visit was "in direct violation of the terms of the written warning" issued to plaintiff by Simpson on October 26, 2004.[78] Immediately after receiving Ms. Miles' response, Bar discussed the situation with Simpson, who agreed that plaintiff should be discharged.[79] Barr did not supply the specific date on which this decision was made, but did state that it was "within two or three days" of Ms. Miles' December 3, 2004 email.[80]

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 8, 2004.[81] In the charge, she

---

[76]*Id.*

[77]Doc. no. 10, Exhibit P (email exchange among Elise Streeter, Ewan Barr, and Karen Miles).

[78]Barr Declaration, at ¶ 4.

[79]*Id.*

[80]*Id.*

[81]Healy Affidavit, at ¶ 5. Plaintiff actually executed the EEOC charge on December 7, 2004. *See* doc. no. 10, at Exhibit Q (Copy of EEOC charge and Notice of Charge of Discrimination).

complained that, when she relayed agents' complaints to Simpson or to members of the corporate management team, the complaints were ignored, and she was retaliated against for making them.  She also complained that she had been denied a promotion to a General Manager position, and threatened with termination, both because of her gender, and because of the complaints she had made.[82]  Both Barr and Simpson stated that, at the time the decision was made to terminate plaintiff's employment, they did not know that she had filed an EEOC charge.[83]

On December 15, 2004, at approximately 3:30 o'clock p.m., an ExpressJet agent named Christopher Robinson received a phone call from an EEOC representative requesting "the name and address of the person who handles EEOC complaints."[84]  Robinson

> informed Guy Simpson that the EEOC was calling about a complaint, and he took the call from there. [Robinson] could hear Mr. Simpson asking "was there a complaint filed." [Simpson] continued asking questions about the nature of the complaint, and he provided the name of "Annicia Miller," in Houston, Texas, as the contact for further processing of the complaint.[85]

Robinson also contacted plaintiff at her home that evening to give her a "heads up"

---

[82]Doc. no. 10, Exhibit Q.

[83]Barr Declaration, at ¶ 4.  *See also* doc. no. 10, Exhibit C (Declaration of Guy Simpson), at ¶ 3.

[84]Doc. no. 14 (Affidavit of Christopher Robinson), at ¶ 1.

[85]*Id.* at ¶ 2.

that the EEOC had called the office, and to ask if it was she who had filed the charge.[86]  Robinson stated that Simpson "knew" it was plaintiff who filed the charge, but he did not represent that the EEOC representative had actually revealed the name of the charging party during the conversation with Simpson.[87]  Plaintiff testified that, other than Robinson's representation that Simpson "knew" it was her, she had no information to indicate that Simpson was actually aware that she had filed the charge.[88]

Also on December 15, 2004, at 2:54 p.m., Ewan Barr sent an email to Karen Miles, asking Miles' approval of a sample termination letter for plaintiff.[89]  The court could locate no copy of this termination letter in the record.  Plaintiff testified that Simpson gave her a copy of the letter on December 16, informed her she would be paid through the end of the calendar year, and asked her to pack up her things and leave the office that day.[90]  She stated she was confused about the situation because, the last day she had been at work, arrangements were being made to remodel offices and provide her with a new computer.[91]

---

[86]Healy Deposition, at 267-71.

[87]*Id.*

[88]*Id.* at 270.

[89]Doc. no. 10, at Exhibit R (December 15, 2004 email from Ewan Barr to Karen Miles).

[90]Healy Deposition, at 24-30.

[91]Healy Affidavit, at ¶ 7.

The EEOC issued its Notice of Charge of Discrimination to ExpressJet on December 16, 2004.  The date stamps on the notice reflect that ExpressJet received it on either December 21 or 22, 2004.[92]

**C.**   *Events Occurring After Plaintiff's Termination*

Plaintiff filed an internal appeal of the decision to terminate her employment.[93] After a hearing in Houston before Karen Miles and Chuck Coble, the Vice President of Customer Service, plaintiff's appeal was denied.  Plaintiff received notice of the denial via letter dated March 24, 2005.[94]

Elice Streeter stated that, when a vacancy results from termination of employment, ExpressJet's standard procedure is to advertise the position without regard to any ongoing internal appeal by the discharged employee.  If the discharged employee's appeal is successful, that employee will be reinstated to her former position. If a new employee has been hired in the interim, the new employee will be transferred to another position, or possibly even another station.[95]

Following plaintiff's termination, Simpson posted the Supervisor position in early January 2005.  All interviews for the position were conducted by Rose Morgan,

---

[92]Doc. no. 10, at Exhibit Q (Notice of Charge of Discrimination).

[93]Streeter Declaration, at ¶ 6; Healy Affidavit, at ¶ 8.

[94]Streeter Declaration, at ¶ 7.

[95]*Id.* at ¶ 8.

who was Manager of Airport Services Training, and Ted Ward, the General Manager at the Louisville, Kentucky station.  Simpson did not participate in the interview process, and he did not discuss any of the candidates with Morgan or Ward.  Morgan and Ward recommended applicant Brad Connor for the position, and, based on that recommendation, Connor was hired on April 1, 2005.[96]  Connor was an ExpressJet employee in Jackson, Mississippi, and had several years of experience in the airport industry, including two years of airline supervisory experience.[97]

**D.**     *Facts Related to Plaintiff's Failure-to-Promote Claim*

Plaintiff states that she desired to advance to a General Manager position within ExpressJet.  ExpressJet posts all open General Manager positions internally, and employees may submit a resume through an on-line application system.  The Regional Senior Director assigned to the station usually makes the final decision on a General Manager hire, although the decision sometimes is made by a panel consisting of the Regional Senior Director and other members of management.[98]

Plaintiff approached Ewan Barr about applying for General Manager positions in Rochester and White Plains, New York, but she never submitted an on-line application for the positions.  She attempted to give Barr a copy of her resume, but

---

[96]Simpson Declaration, at ¶ 4; Streeter Declaration, at ¶ 7.

[97]Simpson Declaration, at ¶ 4.

[98]Barr Declaration, at ¶ 5.

"he wouldn't take it."[99]   The record does not reflect who received the position in White Plains.  Instead, the only evidence in the record indicates that no General Manager position was open in White Plains between the dates of June 16, 2003 and March 10, 2003.[100]   The Rochester position was filled on August 15, 2004, by an individual named Jon A. Foster.  John Mullen, the Regional Senior Director who made the hiring decision, stated that Foster was "the most qualified person for the job based on his interview, experience, and the written job requirements."[101]   Foster had worked for ExpressJet since April 1998 in various positions, and had most recently served as the General Manager at the Madison, Wisconsin station.[102]

Plaintiff did formally submit an application for a General Manager position in Fort Walton Beach, Florida, and John Mullen interviewed her for the job.[103]   During the interview, Mullen asked plaintiff questions that she felt were not indicative of her work skills.  Specifically, Mullen wanted to know "the real truth" about what was "going on" in Huntsville, and what the agents in Huntsville were saying.[104]   Mullen told plaintiff that, if she were a General Manager, she would need to be willing to talk

---

[99]Healy Deposition, at 252-53.

[100]Streeter Declaration, at ¶ 9.

[101]Doc. no. 10, Exhibit S (Declaration of John Mullen), at ¶ 2.

[102]*Id.*

[103]Healy Deposition, at 254.

[104]*Id.* at 255-57.

to him, as her Regional Director, about all the problems in her station.[105]  Mullen stated in a declaration that, when he interviewed plaintiff, he knew that the Huntsville station was "underperforming."[106]  He did not know, however, that plaintiff had made any complaints about discrimination or engaged in any other protected activity.[107]

Mullen ultimately rejected plaintiff's application and chose Lori Mihalik, a female, for the position.[108]  Mullen considered Mihalik "the most qualified person interviewed for the job based on the written job requirements."[109]  Specifically, Mihalik had worked for ExpressJet since June of 2000 as an agent in Gulfport, Mississippi, as a Supervisor in Louisville, Kentucky, and as the acting General Manager in Jackson, Mississippi.  She also had worked for approximately five years as a Retail Sales Manager for K-Mart, where she supervised sixty-five agents in daily operations.[110]

### PART THREE

### *Discussion*

**A.**    *Abandonment of Hostile Work Environment Claim*

---

[105]*Id.*

[106]Mullen Declaration, at ¶ 4.

[107]*Id.*

[108]*Id.* at ¶ 3.

[109]*Id.*

[110]*Id.*

At the summary judgment stage, plaintiff effectively abandoned her claim for gender-based hostile work environment.  Plaintiff has presented no evidence to support a hostile work environment claim, and she has offered no response to defendant's well-supported arguments that summary judgment should be granted on that claim.  Issues and contentions not raised in a party's brief are deemed abandoned. *See, e.g.*, *Chapman,* 229 F.3d at 1027 ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards.").  *Cf. Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)).

> In opposing a motion for summary judgment, a party may not rely on his pleadings to avoid judgment against him.  There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.  . . .

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citations

and internal quotation marks omitted).[111]

**B.**   *Claims Related to the Termination of Plaintiff's Employment*

    **1.**   *Gender Discrimination*

Plaintiff claims that ExpressJet's termination of her employment was the result of gender discrimination.  She does not claim to have direct evidence of a gender-based discriminatory animus.  Thus, she must prove her claim with circumstantial evidence, navigating the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248 (1981).  Under this analysis, a plaintiff must first establish a *prima facie* case of disparate treatment, which creates a presumption of discrimination.  To rebut the presumption, the employer then must articulate a legitimate, nondiscriminatory reason for the disputed employment action.  If the employer does so, the presumption of discrimination drops from the case, and the burden shifts back to the plaintiff to show that defendant's proffered reason is merely

---

[111] *Cf., e.g., Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 n.1 (11th Cir. 2001) ("Lucas has abandoned his unlawful harassment claim by not raising it in his initial brief on appeal.") (citing *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1317 n.17 (11th Cir. 1999) ("Issues that are not clearly outlined in an appellant's initial brief are deemed abandoned.") (citations omitted); *Hartsfield v. Lemacks*, 50 F.3d 950, 953 (11th Cir. 1995) ("We note that issues that clearly are not designated in the initial brief ordinarily are considered abandoned.") (quotation marks and citation omitted); *Marek v. Singletary*, 62 F.3d 1295, 1298 n.2 (11th Cir. 1995) ("Issues not clearly raised in the briefs are considered abandoned.") (citing *Allstate Insurance Co. v. Swann*, 27 F.3d 1539, 1542 (11th Cir. 1994)); *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (declining to address issue for failure of party to argue it in its brief on appeal).

a pretext for unlawful discrimination.  *See McDonnell Douglas,* 411 U.S. at 802-05; *Burdine,* 450 U.S. at 252-56.

      **a.**    *Prima facie case*

      To establish a *prima facie* case of gender-based discrimination in the termination of employment, plaintiff must show that (1) she is a member of a protected class, (2) her employment was terminated, (3) the employer treated similarly situated employees outside of her protected class more favorably, and (4) plaintiff was qualified to perform the duties of her job.  *See, e.g., Scott v. Suncoast Beverage Sales, Ltd.*, 295 F.3d 1223, 1228 (11th Cir. 2002); *Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001).  It is undisputed that plaintiff, a female, is a member of a class of persons protected by Title VII.  The termination of her employment clearly was an adverse employment action.  *See Llampallas v. Mini-Circuits Lab, Inc.,* 163 F.3d 1236, 1246 n.18 (11th Cir. 1998) (stating that termination is the "classic and ultimate 'tangible employment action'").  Further, construing the facts in the light most favorable to plaintiff, she was qualified to perform the duties of her job.  In termination cases — as contrasted to cases involving an employer's failure to hire or promote — the question of whether a plaintiff was qualified to perform the duties of her job often is not an issue.  *See Crapp*, 242 F.3d at 1020.  The Eleventh Circuit has recognized that, "in cases where a plaintiff has held a position

for a significant period of time, qualification for that position sufficient to satisfy the test of a *prima facie* case can be inferred." *Rosenfield v. Wellington Leisure Products, Inc.*, 827 F.2d 1493, 1495 n.2 (11th Cir. 1987); *see also Pace v. Southern Railway Sys.*, 701 F.2d 1383, 1386 n.7 (11th Cir. 1983). Here, due to plaintiff's employment history with ExpressJet and its parent company, Continental Airlines, her qualification for her position can be inferred.

Whether plaintiff can satisfy the third element of the *prima facie* case is a closer call. She identifies no male Supervisor who had a similar record of insubordination and poor performance, but who was not discharged as a result. Instead, she relies solely on the fact that she was replaced by Brad Conner, a male. The court acknowledges that the Eleventh Circuit has, at times, required a female plaintiff in a gender-based termination claim to show only that she was replaced by a male in order to support her *prima facie* case. *See, e.g., Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984); *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980).[112] The court believes this formulation of the *prima facie* case is less appropriate where, as here, the plaintiff was discharged, at least in part, for insubordination or failure to follow the specific directives of a

---

[112]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

superior. Nonetheless, because defendant has not objected, the court will accept plaintiff's alternative formulation of the *prima facie* case. Plaintiff has shown that she was replaced by a male employee, and she has thus satisfied the final element of her *prima facie* case.

> **b.** *Defendant's proffered legitimate, non-discriminatory reasons*

Defendant argues that plaintiff was discharged because of her history of insubordination, her poor performance, and the station's resulting history of underperformance. Specifically, defendant references: (1) plaintiff's May 29, 2004 email to Ewan Barr, in which she acknowledged ignoring Simpson's directives on certain matters and intervening in his confrontations with other employees; (2) plaintiff's October 17, 2004 email to Simpson, in which she made several critical, and admittedly "disrespectful," comments about Simpson's leadership; (3) the derogatory remarks about Simpson that Elise Streeter overheard plaintiff make on November 30, 2004, in the presence of other agents; and (4) the marked decline in the Huntsville station's performance between the months of April and December of 2004. These problems persisted despite two station visits by Ewan Barr and Annicia Miller in June of 2004; a verbal counseling at corporate headquarters in August of 2004; and a written warning and performance plan issued on October 26, 2004, and warning plaintiff that, if her performance and behavior did not improve, she could be

discharged.

    **c.**   *Pretext*

As defendant has proffered legitimate, non-gender-discriminatory reasons for its decision to terminate plaintiff's employment, plaintiff can survive summary judgment on her gender-based termination claim only if she comes "forward with evidence, including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (citing *Burdine*, 450 U.S. at 256; *McDonnell Douglas,* 411 U.S. at 804).  Plaintiff's burden at this step of the analysis is that of "cast[ing] sufficient doubt on the defendants' proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct . . . .'" *Combs*, 106 F.3d at 1538 (quoting *Cooper-Houston v. Southern Railway Co.*, 37 F.3d 603, 605 (11th Cir. 1994)); *see also Chapman*, 229 F.3d at 1024-25.  Plaintiff must show both that defendant's proffered reasons were not the true reasons, and that gender discrimination was the true reason.  *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507-08 (1993).  Plaintiff shoulders that burden by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the

employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont de Nemours & Company*, 100 F.3d 1061, 1072 (3d Cir. 1996)) (internal quotation marks omitted).  Additionally, a plaintiff must produce "sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of *each* of the employer's proffered reasons for its challenged action." *Combs,* 106 F.3d at 1529 (emphasis supplied).

To support her pretext argument, plaintiff points to the fact that she was replaced by a male, and to Simpson's comment that he only hired her because he had to hire a woman.[113]  The mere fact that plaintiff was replaced by a male is not sufficient to show that plaintiff's history of insubordination and poor station performance were not the true reasons for her termination, and that gender discrimination *was* the true reason.  Plaintiff presents no evidence that ExpressJet's selection of Brad Conner was tainted by a discriminatory animus.  Indeed, Rose Morgan, one of the individuals who recommended Connor for the position, was a female.  Further, plaintiff does not call into question Connor's qualifications for the

---

[113]*See* doc. no. 13 (plaintiff's brief), at 17.  Plaintiff also devotes an entire section of her brief to discussing her "rebuttal evidence disputing the pretextual reasons for action suggested by the defendant."  *Id.* at 17.  These arguments all relate to plaintiff's *retaliation* claim, and need not be discussed here, in relation to her gender discrimination claim.

position, nor the manner in which the interview process was conducted.[114]

Simpson's comment about having to hire a female for the Supervisor position also does not cast sufficient doubt on defendant's proffered reasons for discharging plaintiff that a reasonable jury would conclude those proffered reasons are unworthy of credence. If anything, Simpson's comment suggests the company's commitment to hiring females for supervisory positions. Further, Simpson made this comment sometime prior to May 29, 2004, approximately seven months before plaintiff was discharged, and in a context unrelated to the discharge decision. Indeed, the comment was made before *any* of the disciplinary actions involving plaintiff occurred, including the station visits by Barr and Miller in June of 2004, the verbal counseling plaintiff received in August of 2004, and the written warning and performance plan she received in October of 2004. *See, e.g., Rojas v. Florida,* 285 F.3d 1339, 1343 (11th Cir. 2002) (holding that "an isolated comment, unrelated to" the questioned employment decision, is insufficient to show pretext).[115]

---

[114]In her deposition, plaintiff testified that she believed the decision to terminate her employment was motivated by a discriminatory animus because the vacancy in the Supervisor position was posted before her internal appeal was concluded. Healy Deposition, at 245. However, because plaintiff did not raise this issue in her brief, it is not essential to the analysis here. In any event, ExpressJet presented uncontroverted evidence that its standard procedure is to post a vacancy, and to pursue filling it, even when an appeal by a discharged employee is ongoing.

[115]Defendant also argues that no inference of discriminatory motive can be made because Guy Simpson, who hired plaintiff, also was involved in the decision to discharge her. The Eleventh Circuit has held that a *permissible* inference of lack of discriminatory intent arises when the same individual is involved in both hiring and firing decisions. *Williams v. Vitro Services,* 144 F.3d 1438, 1442 (11th Cir. 1998). However, the court cautioned that "it is the province of the jury rather than

In summary, plaintiff has failed to demonstrate that defendant's proffered legitimate, non-discriminatory reasons for terminating her employment are a mere pretext for gender discrimination. Thus, her gender-based discriminatory termination claim must fail.

## 2.    *Retaliation*

Plaintiff also claims that she was terminated in retaliation for engaging in protected activity. Plaintiff attempts to support her retaliation claim with both direct and circumstantial evidence.

### a.    *Direct evidence*

Plaintiff argues that Ewan Barr's comment — that, if Simpson were fired, she also would be fired — constitutes direct evidence of ExpressJet's retaliatory animus. The court disagrees. Direct evidence is generally defined as evidence which, if believed, proves the existence of a fact in issue without the need of an inference or presumption. *See, e.g.*, *Bass v. Board of County Commissioners*, 256 F.3d 1095, 1111 (11th Cir. 2001) (holding that the term "direct evidence," when used in the context of a Title VII race discrimination claim, "refers to a type of evidence which,

---

the court . . . to determine whether the inference generated by 'same actor' evidence is strong enough to outweigh a plaintiff's evidence of pretext." *Id.* at 1443. Thus, although the court acknowledges that the "same actor" evidence in this case does present an inference of non-discrimination, it is hesitant to assign too much weight to the inference, especially in the light of other evidence supporting defendant's proffered legitimate, non-discriminatory reasons for discharging plaintiff.

if true, would require no inferential leap in order for a court to find discrimination"); *Carter v. Three Springs Residential Treatment*, 132 F.3d 635, 642 (11th Cir. 1998) ("Direct evidence, by definition, is evidence that does not require . . . an inferential leap between fact and conclusion."); *Burrell v. Board of Trustees of Georgia Military College*, 125 F.3d 1390, 1393 (11th Cir. 1997) (defining direct evidence of discrimination as evidence which, "if believed, proves [the] existence of [a] fact in issue without inference or presumption").

In the context of employment discrimination cases, direct evidence of an employer's intent to discriminate on the basis of some prohibited characteristic is more specifically defined as "evidence which reflects 'a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'" *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (quoting *Carter*, 132 F.3d at 641 (in turn quoting *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990)). As such, "direct evidence of discrimination is powerful evidence capable of making out a prima facie case essentially by itself." *Jones v. Bessemer Carraway Medical Center*, 151 F.3d 1321, 1323 n.11 (11th Cir. 1998) (*per curiam*).

Due to the "powerful" nature of direct evidence, the Eleventh Circuit "has marked severe limits for the kind of language [that may] be treated as direct evidence

-36-

of discrimination." *Id.* (citing *Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 962 (11th Cir. 1997); *Burrell*, 125 F.3d at 1393-94 & n.7; *Earley v. Champion International Corp.*, 907 F.2d 1077, 1082 (11th Cir. 1990)). "To amount to direct evidence, a statement must:  (1) be made by a decisionmaker; (2) specifically relate to the challenged employment decision; and (3) reveal blatant discriminatory animus." *Chambers v. Walt Disney World Co.*, 132 F. Supp. 2d 1356, 1364 (M.D. Fla. 2001).  Evidence that merely suggests a discriminatory motive, *see Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999), or that is subject to more than one interpretation, *see Harris v. Shelby County Board of Education*, 99 F.3d 1078, 1083 n.2 (11th Cir. 1996), "does not constitute direct evidence."  *Merritt v. Dillard Paper Co.,* 120 F.3d 1181, 1189 (11th Cir. 1997).  The Eleventh Circuit has given the following classic example of direct evidence of an employer's intent to discriminate on the basis of an employee's age:  *i.e.,*  "a management memorandum saying, 'Fire Earley — he is too old.'"  *Damon*, 196 F.3d at 1359 (quoting *Earley*, 907 F.2d at 1082).

Here, Barr was involved in the ultimate decision to terminate plaintiff's employment, and his comment did concern termination.  Even so, Barr's comment does not reflect, without the benefit of inference or presumption, a blatant retaliatory animus directly correlating to plaintiff's discharge.  Barr did not say, "if Simpson is

fired, you will be fired for making complaints about him." What he did say — "If he goes, you go" — is subject to more than one reasonable interpretation. To put the comment in context, Barr had been telling plaintiff and Simpson that he was tired of all the complaints he had received from the Huntsville station (*not* that he was tired of complaints from plaintiff and Simpson personally). By his comment, Barr could have intended to emphasize the importance of plaintiff getting along with Simpson and fostering a cooperative working environment, and to admonish plaintiff that if she and Simpson failed at those efforts, both of them could lose their jobs as a result. Barr also could have meant that, if the Huntsville agents' complaints were not successfully resolved, plaintiff would be held equally responsible for the situation with Simpson.

Because Barr's comment is subject to more than one interpretation, and because it does not, without the benefit of any inference or presumption, reveal a blatant retaliatory animus, it does not constitute direct evidence of retaliation.

**b.**   *Circumstantial evidence*

As plaintiff has no direct evidence of retaliation, she must prove her claim through the use of circumstantial evidence. A plaintiff generally must prove three elements to establish a *prima facie* case of retaliation: (1) she engaged in statutorily protected expression; (2) she suffered an adverse employment action; and (3) there

was a causal linkage between the protected conduct and the adverse employment action. *See, e.g., Shannon v. BellSouth Telecommunications, Inc.*, 292 F.3d 712, 715 (11th Cir. 2002).

Again, it is undisputed that plaintiff suffered an adverse employment action — her termination.  It also is undisputed that plaintiff's filing of an EEOC charge constituted statutorily protected expression.

It is questionable whether plaintiff believes she engaged in any protected conduct *other than filing her EEOC charge*, as she focuses strongly on the filing of the charge in her brief.  She does mention, in passing, that she "advocat[ed] protected activity on behalf of her subordinates."[116]  The only complaint plaintiff made on behalf of other employees that could even arguably be considered protected activity was when she informed Simpson, in early 2004, that Valerie Watts called Marilyn Crowley an "old bitch."  She also points out that she wrote in her May 29, 2004 email to Ewan Barr that Simpson told her he had to hire a woman for her position.[117]  Even if the two complaints referenced above can be considered the advocation of protected activity under Title VII, however, plaintiff cannot demonstrate a causal linkage

---

[116]Doc. no. 13 (plaintiff's brief), at 19.

[117]Plaintiff made many other complaints, both to Simpson, and to other members of ExpressJet's management team.  However, other than the two complaints mentioned above, all of her grievances concerned everyday management issues such as shift assignments, vacation time, and Simpson's demeanor with other agents, and they therefore cannot be considered protected activity under Title VII.

between the complaints and her subsequent termination.

The demonstration of a casual linkage at the summary judgment stage is far less onerous than proving causation by a preponderance of the evidence at trial. At the summary judgment stage, "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." *Meeks v. Computer Associates International*, 15 F.3d 1013, 1021 (11th Cir. 1994) (quoting *EEOC v. Reichhold Chemical, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir. 1993)). "At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action." *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993). *Accord Raney v. Vinson Guard Service, Inc.*, 120 F.3d 1192, 1197 (11th Cir. 1997) ("[A] plaintiff must, at a minimum, generally establish that the defendant was actually aware of the protected expression at the time the defendant took the adverse employment action."). *See also*, *e.g.*, *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000) ("[A] plaintiff must show that 'the decisionmakers were aware of the protected conduct,' and 'that the protected activity and the adverse action were not wholly unrelated.'") (quoting *Farley v. Nationwide Mut. Ins.*, 197 F.3d 1322, 1337 (11th Cir. 1999)).

"Close temporal proximity between the protected activity and the adverse

-40-

action *may* be sufficient to show that the two were not wholly unrelated." *Bass,* 256 F.3d at 1119 (citing *Gupta,* 212 F.3d at 590) (emphasis supplied). The Supreme Court has indicated that, to be sufficient standing alone, the temporal gap between events must be "'very close.'" *Clark County School District v. Breeden*, 532 U.S. 268, 273 (2001) (*per curiam*) (quoting *O'Neal v. Ferguson Construction Company*, 237 F.3d 1248, 1253 (10th Cir. 2001)).[118]   The time gap between plaintiff's complaints and her subsequent termination cannot be considered "very close." Plaintiff testified that she complained about Valerie Watts's inappropriate age-related comment "before spring" of 2004. She sent her email to Ewan Barr on May 29, 2004. Thus, the *latest* of her complaints occurred approximately six and one-half months before her December 15 termination. Both the Supreme Court and the Eleventh Circuit have indicated that even a period as short as three months is too long to constitute independent evidence of causation. *See Breeden*, 532 U.S. at 1511; *Higdon*

---

[118] In full text, the Supreme Court's statement in *Breeden* concerning temporal proximity is as follows:

> The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be "very close," *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (C.A.10 2001). *See e.g., Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (C.A.10 1997) (3-month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174-1175 (C.A.7 1992) (4-month period insufficient). Action taken (as here) 20 months later suggests, by itself, no causality at all.

*Breeden*, 532 U.S. at 273-74.

v. Jackson, 393 F.3d 1211, 1221 (11th Cir. 2004).  Thus, plaintiff cannot establish a causal connection between her complaints and her termination based on temporal proximity alone.

She also has not offered any *additional* evidence to support a causal connection.  The other evidence in the record actually weighs *against* finding a causal connection.  As ExpressJet points out, during the time period between plaintiff's complaints and her termination, management employees counseled her on her performance and behavior problems and gave her the opportunity to improve. Additionally, after plaintiff made the two complaints at issue, she continued to engage in insubordinate and inappropriate behavior, two examples of which are her email to Simpson in October 2004, and the comments made in front of Elise Streeter in late November of 2004.  This intervening insubordinate behavior further weakens any causal connection between plaintiff's complaints and her subsequent termination. *See, e.g., Taylor v. CSX Transportation,* 418 F. Supp. 2d 1284, 1302 (M.D. Ala. 2006) (holding that intervening events can break the causal connection between protected activity and subsequent adverse employment actions) (citations omitted).

Plaintiff also cannot establish a causal connection between the filing of her EEOC charge and her subsequent termination.  At first blush, the connection seems obvious — plaintiff filed an EEOC charge on December 8, 2004; Simpson received

a telephone call about an EEOC charge on December 15, 2004; and plaintiff was handed a letter of termination on December 16, 2004.   However, a deeper examination of the facts leads to a different conclusion.   First, there is no evidence that the EEOC ever identified plaintiff as the claimant during its December 15 telephone call to the ExpressJet Huntsville station.   Christopher Robinson's affidavit, which plaintiff submitted as evidence to support a causal connection, states only that he received a telephone call from an EEOC representative at approximately 3:30 p.m. on December 15; that he forwarded the call to Simpson; and that Simpson asked the representative whether a complaint had been filed, asked additional questions about "the nature of the complaint," and stated that the charge should be forwarded to Annicia Miller in the Houston office.   Robinson *did not* state that either he or Guy Simpson learned that plaintiff was the charging party during the course of the EEOC representative's telephone call.[119]   Indeed, even though Robinson *assumed* the charge came from plaintiff, he still had to telephone plaintiff at home later that evening to find out for sure.

Further, the record reveals that ExpressJet made the decision to terminate plaintiff's employment *before* plaintiff filed her charge.   Elise Streeter reported what she believed to be plaintiff's inappropriate behavior to Karen Miles and Ewan Barr

---

[119]Doc. no. 14 (plaintiff's evidentiary submission), at Exhibit 1 (Affidavit of Christopher Robinson).

on November 30 and December 1, 2004.  Miles stated in an email dated December 3, 2004, that she supported the decision to terminate plaintiff's employment. Simpson agreed with the decision, and the decision was made final within two to three days of December 3, *before* plaintiff filed her charge.  Plaintiff has presented no additional evidence that, at the time the termination decision was made, the decisionmakers were aware that she even *planned* to file a charge.  Plaintiff cannot establish a causal connection between her protected expression and her subsequent termination when the relevant decisionmakers were not even aware of the protected expression.  *See, e.g., Hairston*, 9 F.3d at 919.

Finally, the fact that plaintiff's termination was not fully *implemented* until after plaintiff filed her charge also does not support a causal connection, because the termination *decision* was contemplated and, indeed, made final, before the charge was filed.  *See Breeden*, 532 U.S. at 272 ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."); *Summerlin v. M & H Valve Co.*, 167 Fed. Appx. 93, 97 (11th Cir. 2006) (holding that the plaintiff failed to establish a causal connection between protected activity and adverse action where the employer made the decision to write the plaintiff up ten days before the plaintiff filed an EEOC

complaint, even though the formal write-up did not issue until several days after the complaint was filed); *Saffold v. Special Counsel, Inc.*, 147 Fed. Appx. 949, 951 (11th Cir. 2005) ("When an employer makes a tentative decision *before* protected activity occurs, the fact that an employer proceeds with such a decision is not evidence of causation.") (emphasis in original).

**C.**    *Failure to Promote*

Despite defendant's well-founded arguments that summary judgment should be granted on plaintiff's failure-to-promote claim, plaintiff makes only a brief, passing reference to that claim in her brief. She states, in the fact section of the brief, that ExpressJet "failed to consider [her] for promotion because of her pressing to resolve employment problems related to protected activity."[120]    She offers no argument whatsoever on the issue. By plaintiff's failure to address the issue in anything more than a conclusory fashion in her brief, she has most likely abandoned her failure-to-promote claim.[121] Even so, in a generous effort to interpret plaintiff's claims in the light most favorable to her, the court will also briefly explain why the failure-to-promote claim fails on the merits, with regard to all the promotion decisions in question.

---

[120]Doc. no. 13 (plaintiff's brief), at 6-7, ¶ 15.

[121]*See* Part Three, Section A, *supra.*

1.    *White Plains position*

Plaintiff first asserts that she was discriminatorily denied a promotion to a General Manager position in White Plains, New York.  However, ExpressJet offered evidence, uncontroverted by plaintiff, that no GM position was open in White Plains between June 16, 2003 and March 10, 2005.  Thus, plaintiff could not have applied for, and been denied, the position between these dates.  If she applied for and was denied the position prior to June 16, 2003, any claim arising out of that denial would be barred as untimely, because it would have occurred more than 180 days prior to her filing of an EEOC charge.  *See* 42 U.S.C. § 2000e-5(e)(1); *see also, e.g., Alexander v. Fulton County*, 207 F.3d 1303, 1332 (11th Cir. 2000) ("No action alleging a violation of Title VII may be brought unless the alleged discrimination has been made the subject of a timely-filed EEOC charge."); *Stafford v. Muscogee County Board of Education*, 688 F.2d 1383, 1387 (11th Cir. 1982) ("In order to assert a claim of racial discrimination under Title VII, a claimant must file a complaint with the EEOC within 180 days after the alleged discriminatory practice occurred.").

2.    *Rochester position*

Plaintiff also complains that ExpressJet denied her a promotion to the General Manager position in Rochester[122] due to unlawful gender discrimination.  Even

---

[122]The court assumes this reference is to Rochester, New York, although the record does not clearly so state.

assuming that plaintiff could support a *prima facie* case on this aspect of her failure-to-promote claim, she offers no evidence, or even any argument, to show that defendant's proffered legitimate, non-discriminatory reasons for choosing a male to fill the Rochester position are a mere pretext for gender discrimination.

ExpressJet stated that it hired Jon Foster for the Rochester GM position because he was "the most qualified person for the job based on his interview, experience, and the written job requirements."[123] Specifically, Mr. Foster had worked with ExpressJet since 1998, and had previously served as General Manager in another station. Plaintiff has offered no evidence or argument to cast doubt on these facts, or to suggest a discriminatory motive. "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . extensive evidence of legitimate, non-discriminatory reasons for its action." *Carter v. City of Miami*, 870 F.2d 578, 585 (11th Cir. 1989). *See also Howard v. BP Oil Co., Inc.*, 32 F.3d 520, 526 (11th Cir. 1994) (summary judgment proper where the plaintiff fails to produce evidence to discredit the defendant's explanation of its action).

**3.** *Fort Walton Beach position*

Plaintiff asserts that she was denied a promotion to a GM position in Fort

---

[123]Mullen Declaration, at ¶ 2.

Walton Beach, Florida, in retaliation for engaging in protected activity.  Again, even assuming plaintiff could make out a *prima facie* case on a retaliatory failure-to-promote claim, she cannot demonstrate that defendant's proffered legitimate, non-discriminatory reasons for its decision not to award plaintiff the promotion were a mere pretext for retaliation.

ExpressJet states that it hired Lori Mihalik for the Fort Walton Beach position because she was "the most qualified person interviewed for the job based on the written job requirements."[124]  Specifically, Mullen had worked for ExpressJet since the year 2000 in various supervisory capacities, including the position of acting General Manager in Jackson, Mississippi.  She also had five years of previous management experience in the retail industry.  Again, plaintiff has offered no evidence or argument to cast doubt on these facts, or to suggest they serve as a mere pretext for retaliation.  *See Carter*, 870 F.2d at 585; *Howard*, 32 F.3d at 526.

In summary, plaintiff has failed to carry her burden of demonstrating that ExpressJet's decisions not to award her promotions to General Manager positions in White Plains, Rochester, and Fort Walton Beach were the result of unlawful gender discrimination or retaliation.  Therefore, her failure-to-promote claim must fail.

## PART FOUR

---

[124]Mullen Declaration, at ¶ 3.

*Conclusion*

Based on all of the foregoing, defendant's motion for summary judgment is due to be granted, and all of plaintiff's claims are due to be dismissed with prejudice.  An appropriate order will be entered contemporaneously herewith.

DONE this 27th day of April, 2007.

_____
United States District Judge